**STUDENTS AGAINST GENOCIDE, et al., Appellants,**

v.

**DEPARTMENT OF STATE, et al., Appellees.**

No. 99–5316.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 6, 2000.

Decided Aug. 7, 2001.

George S. LaRoche argued the cause and filed the briefs for appellants.

Douglas N. Letter, Appellate Litigation Counsel, U.S. Department of Justice, argued the cause for appellees. With him on the brief were David W. Ogden, Acting Assistant Attorney General at the time the brief was filed, and Wilma A. Lewis, U.S. Attorney at the time the brief was filed. Leonard Schaitman, Attorney, entered an appearance.

Before: ROGERS and GARLAND, Circuit Judges and SILBERMAN, Senior Circuit Judge.*

GARLAND, Circuit Judge:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Students Against Genocide and other individuals and organizations (collectively "SAGE" or "plaintiff") seek agency records relating to human rights violations committed by Bosnian Serb forces in Bosnia during the summer of 1995. We affirm the district court's grant of summary judgment in favor of the agencies, and remand a limited issue regarding SAGE's eligibility for attorney's fees and costs.

I

Plaintiff's FOIA requests focus primarily on a presentation made by then-U.S. Ambassador Madeleine Albright to the United Nations Security Council on August 10, 1995. A *New York Times* article published the following day reported that Albright "told a closed door session of the Security Council that 2,000 to 2,700 missing Bosnians ... might have been shot by the Bosnian Serbs" when the Serbs seized the Bosnian town of Srebrenica in July 1995. Barbara Crossette, *U.S. Seeks to Prove Mass Killings*, N.Y. TIMES, Aug. 11, 1995, at A3. According to the article, Albright supported the allegation by showing classified "spy satellite" and "spy plane" photographs to the Security Council.

The *Times* article reported that some of the photographs, taken in mid-July 1995, showed "mounds of freshly dug patches of earth" in areas where Bosnian Muslim families were said to have been "herded together." One photograph showed "about 600 people gathered in a soccer field," and another, taken a few days later, showed "areas of freshly dug earth" at the same location. The article reported that after Albright's presentation, the Clinton Administration publicly released three of the photographs, "taken from a U-2 spy plane," that "showed the disturbed soil." The Administration decided to publicize the photographs, the article reported, "to put pressure on the Bosnian Serbs to support a new peace effort being promoted among European allies and the warring parties in the Balkans." *Id.*

On October 12 and 18, 1995, SAGE filed identical requests for production of four categories of records from the Department of State, the Department of Defense, and the Central Intelligence Agency (CIA). As subsequently clarified, the first two request categories, based on the *New York Times* article, sought all photographs and documents used by Albright during her presentation to the Security Council. The third category, of a more general nature, sought any documentation of atrocities in Bosnia from 1993 to the present. The fourth category sought information referred to in a letter that Michael Habib, Director of the State Department's Office of Eastern European Affairs, sent to Beth Stephens, of the Center for Constitutional Rights, on March 24, 1993. The "Habib Letter" stated that the United States had reported information concerning "rape and other grave breaches of the Geneva Conventions" to the United Nations. Letter from M. Habib to B. Stephens (Mar. 24, 1993) (quoted in *Kadic v. Karadzic*, 70 F.3d 232, 250 n. 10 (2d Cir.1995)).[1]

---

* Senior Judge Silberman was in regular active service at the time of oral argument.

1. The four request categories were as follows:

(1) All of the satellite photographs and aerial photographs taken in the Srebrenica area of Bosnia ... by U.S. spy planes and satellites which surveyed the area when and immediately after Srebrenica was overrun by Bosnian Serb forces in, about, and after July 11th, 1995, including those pictures of people crowded into a soccer field and other places before, during and after they were massacred, including all of those displayed by Madeleine K. Albright, the United States delegate to the United Nations, to the mem-

In April 1996, at which time the agencies had not yet released any documents in response to plaintiff's FOIA requests, SAGE filed a complaint in the United States District Court for the District of Columbia. SAGE sought an order, pursuant to 5 U.S.C. § 552(a)(4)(B) and (E), directing the agencies to produce the four categories of requested records and to pay attorney's fees and other litigation costs. SAGE subsequently dismissed its claim with respect to the "Category Three" request, and only the Category One, Two, and Four requests remain at issue in this litigation.

On October 10, 1997, after producing documents in response to plaintiff's requests, the defendant agencies filed a motion for summary judgment.[2] The agencies asserted that they had conducted a reasonable search and had released all responsive documents (or reasonably segregable portions thereof), except those that were exempt from release under (inter alia) two FOIA exemptions: Exemption 1, which protects records properly classified in the interest of national defense or foreign policy, 5 U.S.C. § 552(b)(1), and FOIA Exemption 3, which protects records specifically exempted from disclosure by statutes other than FOIA, 5 U.S.C. § 552(b)(3). Defs.' Mot. for Partial Summ. J. at 8.

The district court referred the case to a magistrate judge, who conducted a hearing and issued a report recommending that the court grant the agencies' motion for summary judgment. In his report, the magistrate first noted SAGE's complaint that the agencies had produced, or withheld and indexed, many documents plaintiff believed were outside the scope of its requests. The magistrate explained that during the hearing it had become clear that the parties had "different interpretations" of the breadth of SAGE's requests. *Students Against Genocide v. Dep't of State*, No. CIVA96–667, 1998 WL 699074, at *3 (D.D.C. Aug.24, 1998) ("First Mag. Rep't"). Plaintiff, he said, "view[s] [its] requests as very narrow, seeking at most a handful of photographs and documents utilized by Albright at her presentation to the U.N. Security Council, and a few specific documents to which a [Department of State] official (Habib) referred in a particular letter." *Id.* The agencies, by contrast, "read the requests much more broadly by focusing on the phrase 'documents *containing* the allegedly "sensitive information" shared' by Albright with the Security

bers of the United Nations Security Council on or about August 10th, 1995 . . . .

(2) The documents containing the allegedly "sensitive information" shared on or about August 10th, 1995, by the United States with the members of the Security Council, and the "unique information" obtained by the United States and shared at the same time with the members of the Security Council as well as the eyewitness accounts and U.S. Intelligence data which "provides compelling evidence of barbarous and systematic murder by the Bosnia Serbs" in the area of Srebrenica . . . specifically referred to by Madeleine Albright in her statement to the Security Council on or about August 10, 1995.

(3) Any documentation of the above nature pertaining to the commission of war crimes, genocide and atrocities in Bosnia from 1993 to the present . . . .

(4) [Information concerning] "rape and other grave breaches of the Geneva Conventions" stated by Michael J. Habib, Director, Office of Eastern European Affairs, United States Department of State, to have been "reported" by the United States "to the United Nations" in his letter to Beth Stephens, Center for Constitutional Rights, March 24, 1993.

J.A. at 12–13, 18.

**2.** The agencies' motion was for partial summary judgment regarding Categories One, Two, and Four. As noted, SAGE subsequently dismissed its claim regarding Category Three.

Council.... Thus, they searched for, and produced, documents which were not necessarily used at the presentation but which *contained* the information Albright shared." *Id.*

The magistrate also reported that SAGE "sought a statement from defendants that the documents which were processed ... were responsive to plaintiffs' three very specific information requests." *Id.* Accordingly, the magistrate had "secured a statement from the defendants that the information transmitted to [SAGE] was responsive to categories one and two of the request as they related to Albright's presentation." *Id.* The government further confirmed that all of the information responsive to plaintiff's Category One and Two requests had either been released or withheld as exempt. *Id.* (quoting Tr. at 48). With respect to Category Four, the information referred to in the Habib Letter, the government represented that it had located three documents responsive to the request and had released all three to plaintiff. *Id.* at 11 n. 17. The magistrate pronounced himself satisfied with "the responsiveness of the released information." *Id.* at 4.

Finally, the magistrate turned to the agencies' searches, and to the affidavits, commonly known as *Vaughn* indices,[3] that listed the withheld documents and justified their withholding under FOIA Exemptions 1 and 3. After reviewing the agencies' declarations, the magistrate found the searches reasonable, the *Vaughn* indices sufficiently detailed, and the exemptions properly invoked. As a result, the magistrate recommended that the district court grant the agencies' motion for summary judgment.[4]

On September 29, 1998, after conducting a de novo review of the summary judgment materials, the district court adopted the magistrate's report in full. In addition, the court rejected SAGE's argument that the magistrate should not have accepted the representations of government counsel that the documents produced and/or indexed were responsive to plaintiff's requests, but should instead have required counsel to file further affidavits. The court held that SAGE had waived this argument by failing to assert it before the magistrate. *See Students Against Genocide v. Department of State,* No. 96cv0667, slip op. at 3–4 (D.D.C. Sept. 29, 1998) ("Dist. Ct. Op.").

After the district court granted summary judgment, but before the time for appeal had run, plaintiff filed a motion to reconsider based on further disclosure letters it had received from the government. The district court issued an order requiring the government to respond, and, after further pleadings, again referred the matter to the magistrate. Upon the government's second motion for summary judgment, the magistrate determined that a component of the Department of Defense, the Defense Intelligence Agency (DIA), had found and properly withheld a single document—a classified memorandum from the Director of the DIA to the Chairman of the Joint Chiefs of Staff. *Students Against Genocide v. Dep't of State,* 50 F.Supp.2d 20 (D.D.C.1999) ("Second Mag. Rep't"). The district court denied SAGE's motion for reconsideration of its first summary judgment order, and, on July 22, 1999, adopted the magistrate's recommendation to grant the government's second

---

3. *See Vaughn v. Rosen,* 484 F.2d 820, 827–28 (D.C.Cir.1973); *see also Mays v. DEA,* 234 F.3d 1324, 1326 (D.C.Cir.2000).

4. The magistrate also found that one document was covered by Exemptions 5 (deliberative process privilege) and 6 (personal privacy). Those exemptions are not at issue on appeal.

motion for summary judgment. SAGE then filed the instant appeal.[5]

## II

 FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions. *See* 5 U.S.C. § 552(a)(3)(A), (b). In a suit brought to compel production, an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates "that each document that falls within the class requested either has been produced ... or is wholly exempt from the Act's inspection requirements." *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978); *see Billington v. Dep't of Justice,* 233 F.3d 581, 583–84 (D.C.Cir.2000). Moreover, in national security cases like this one, "Congress has instructed the courts to accord 'substantial weight' to agency affidavits." *Goland,* 607 F.2d at 352; *see also Abbotts v. Nuclear Regulatory Comm'n,* 766 F.2d 604, 606 (D.C.Cir.1985).

The two FOIA exemptions at issue in this case are Exemptions 1 and 3. Exemption 1 declares that FOIA is inapplicable to matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). To support its Exemption 1 claims, the government invoked Executive Order 12,958, which authorizes the classification of (inter alia) information that concerns "intelligence sources or methods,"[6] and Executive Order 12,951, which specifies that imagery acquired by space-based national intelligence reconnaissance systems "shall be kept secret in the interests of national defense and foreign policy until deemed otherwise by the Director of Central Intelligence."[7] FOIA Exemption 3 applies to matters "specifically exempted from disclosure by [a] statute" other than FOIA. 5 U.S.C. § 552(b)(3). To support its Exemption 3 claims, the government invoked the National Security Act of 1947, which provides that the Director of Central Intelligence shall "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403–3(c)(6); *see Miller v. Casey,* 730 F.2d 773, 777 (D.C.Cir.1984) (holding that this provision of the Act supports Exemption 3).[8]

In the following Parts, we consider SAGE's challenges to the adequacy of the agencies' responses to the three request categories still at issue in this litigation. We review the district court's grant of

---

**5.** SAGE filed its notice of appeal two days after the deadline set by Federal Rule of Appellate Procedure 4(a)(1)(B). The district court granted SAGE's timely motion to extend the time for appeal under Rule 4(a)(5), which authorizes district courts to grant an extension upon a showing of "excusable neglect." We review such orders on an abuse of discretion standard, *see Johnson v. Lehman,* 679 F.2d 918, 919–20 (D.C.Cir.1982), and we reject the government's suggestion that the district court's determination of "excusable neglect" constituted such an abuse. *See Pioneer Inv. Servs. Co. v. Brunswick Assoc.,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); *Marx v. Loral Corp.,* 87 F.3d 1049, 1054 (9th Cir.1996).

**6.** Exec. Order No. 12,958, § 1.5(c), 60 Fed. Reg. 19,825 (Apr. 17, 1995), *reprinted in* 50 U.S.C. § 435.

**7.** Exec. Order No. 12,951, § 2, 60 Fed.Reg. 10,789 (Feb. 22, 1995), *reprinted in* 50 U.S.C. § 435.

**8.** The CIA also invoked the Central Intelligence Agency Information Act of 1984, 50 U.S.C. § 431, in support of its claim to protection under Exemption 3. As the government notes, however, we need not consider SAGE's challenge to the applicability of that Act because the agency invoked the National Security Act for the same photographs.

summary judgment de novo. *See Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C.Cir. 2001).

### III

SAGE's Category One request, as clarified during the litigation, sought the satellite and aerial (airplane) photographs of the Srebrenica area that Ambassador Albright actually displayed to the United Nations Security Council on August 10, 1995. In response to this request, the government released fourteen aerial photographs, two of which it specifically identified as photographs displayed by the Ambassador. All other responsive photographs were withheld on grounds of national security, pursuant to FOIA Exemptions 1 and 3.[9] The government confirmed that one of the withheld documents was the photograph of 600 people crowded into a soccer field, as referred to in the *New York Times* article. First Mag. Rep't, 1998 WL 699074, at *4. The CIA is the only agency currently withholding records responsive to Category One.

SAGE has three objections to the manner in which the agencies have responded to its Category One request. We consider those objections below.

### A

Plaintiff first suggests that the agencies must not have found and/or released all responsive photographs, because they have not expressly said so by affidavit. The magistrate, however, obtained and accepted the representation of agency counsel that the photographs released to SAGE, together with those withheld as exempt, constitute all photographs responsive to plaintiff's Category One request. First Mag. Rep't, 1998 WL 699074, at *3–4. Government counsel made the same representation to this court at oral argument.

■ In the district court, plaintiff objected to the magistrate's report on the ground that the magistrate should not have accepted counsel's representations, but instead should have required the agencies to file additional affidavits to the same effect. The district court rejected this argument, holding that plaintiff had waived it by failing to raise it before the magistrate. Dist. Ct. Op. at 3–4.[10] In this

---

9. The government stated that any satellite imagery that existed was protected from disclosure under Exemptions 1 and 3, but that it could neither confirm nor deny the existence of such imagery. Strickland Decl. at 6. We have held such a response, commonly referred to as a *Glomar* response, to be "appropriate where an acknowledgment that records exist would provide the requester with the very information the exemption is designed to protect." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 894 n. 8 (D.C.Cir.1995); *see Phillippi v. CIA*, 546 F.2d 1009, 1015 (D.C.Cir.1976) (remanding for further proceedings case in which the CIA refused to confirm or deny the existence of materials relating to a vessel called the *Glomar Explorer*). On appeal, SAGE raises no issues regarding the government's assertion of a *Glomar* response.

10. The court stated:

Plaintiffs neither requested during the hearing, nor in the three intervening months between the hearing and the Report and Recommendation, that the Court or the Magistrate Judge direct defendants to provide affidavits containing the declarations made on the record regarding the adequacy of the search and the responsiveness of the information released and withheld.

*Id.* at 2–3. In support of its conclusion that this failure waived the objection, the district court cited *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."), and *Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.").

court, plaintiff's opening brief did not challenge the district court's holding of waiver. Although plaintiff did address the issue in its reply, we have repeatedly held that an argument first made in a reply brief ordinarily comes too late for our consideration, and we see no reason to depart from that rule here. *See, e.g., Bd. of Regents of the Univ. of Washington v. EPA*, 86 F.3d 1214, 1221 (D.C.Cir.1996) ("By failing to make any specific objection until their reply brief, petitioners deprived the [respondents] of the opportunity to respond. To prevent this ..., we have generally held that issues not raised until the reply brief are waived.").

### B

SAGE's second objection to the government's Category One response relates to the photographs withheld by the CIA. SAGE does not contest that those photographs were, at least initially, properly classified and exempt from disclosure under FOIA Exemptions 1 and 3. *See* First Mag. Rep't, 1998 WL 699704, at *8. It contends, however, that in light of the way the government subsequently treated those photographs, any otherwise applicable exemptions have been waived.[11] This argument has two variations.

### 1

■ SAGE first argues that since the government did release fourteen photographs, thereby acknowledging that their disclosure would not harm the national security, it cannot plausibly assert that disclosure of the remaining photos would be injurious. Moreover, SAGE contends that even if disclosure of the remaining photos would be harmful, whatever damage their release could do has already

been done by the disclosure of the fourteen.

We disagree. The fact that some "information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations." *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C.Cir. 1990). The CIA's affidavit provided a detailed description of the risk to intelligence sources and methods posed by release of reconnaissance imagery. *See* Strickland Decl. at 5–15. Of special concern was the risk that professional image analysts would be able to combine a photograph with other known information to determine the technical capabilities of the reconnaissance system that produced it, and that once those capabilities were determined, foreign governments would be able "to take countermeasures to conceal activities of interest to U.S. foreign policymakers." *Id.* at 9. The CIA's expert averred that the released photographs were "individually reviewed" for these concerns, and were released only after it was determined that "release of these ... particular images would not damage the national security." *Id.* at 15. He concluded, however, that release of any withheld documents "reasonably could be expected to result in" such damage. *Id.*

The assessment of harm to intelligence sources and methods "is entrusted to the Director of Central Intelligence, not to the courts." *Fitzgibbon*, 911 F.2d at 766. Moreover, particularly because the government did release numerous photographs, we see no reason to question its good faith in withholding the remaining photographs on national security grounds. Accordingly, we reject SAGE's contention that by

---

11. The district court ruled that SAGE had waived this waiver argument by failing to raise it before the magistrate. *Dist. Ct. Op.* at 3. However, because the government con-

cedes that "plaintiffs' counsel did appear to raise this argument" at the magistrate hearing, we consider it here. Govt. Br. at 57 n.7.

releasing some photographs to plaintiff, the government waived its right to withhold any others. *Cf. Military Audit Project v. Casey,* 656 F.2d 724, 753–54 (D.C.Cir.1981) (noting that penalizing an agency for voluntarily declassifying documents would "work mischief" by creating an incentive against disclosure).

2

■ SAGE also argues that Ambassador Albright waived the government's right to invoke the FOIA exemptions by displaying the withheld photographs to the delegates of the foreign governments that are members of the Security Council. Once those delegates saw the photographs, SAGE argues, any legitimate national security interest in keeping them secret was lost.

■ This circuit has held that the government may not rely on an otherwise valid exemption to justify withholding information that is already in the "public domain." *See Cottone v. Reno,* 193 F.3d 550, 554–55 (D.C.Cir.1999); *Fitzgibbon v. CIA,* 911 F.2d at 765–66; *Afshar v. Dep't of State,* 702 F.2d 1125, 1130–31 (D.C.Cir. 1983). We have noted, however, that "while the logic of FOIA postulates that an exemption can serve no purpose once information ... becomes public, we must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before we find a waiver." *Cottone v. Reno,* 193 F.3d at 555 (internal quotation and citation omitted). For the public domain doctrine to apply, the specific information sought must have already been "disclosed and preserved in a permanent public record." *Id.* at 554; *see Davis v. Dep't of Justice,* 968 F.2d 1276, 1280 (D.C.Cir. 1992).

The photographs in question here plainly do not fall within that doctrine. They were not released to the general public; only the Security Council delegates saw them. In fact, the photographs were not "released" at all. Although Ambassador Albright displayed them to the delegates, she retained custody, and none left the U.N. chamber. *See* Grafeld Decl. at 19. Hence, there is no "permanent public record" of the photographs. *See Cottone,* 193 F.3d at 554.

SAGE acknowledges that this case does not fall within the letter of the public domain doctrine, but urges that it represents merely "a slight variation" on the theme. SAGE Br. at 24. Although the photographs were not released into the public domain, plaintiff argues that they were displayed to the very parties against whom the exemption was intended to provide protection: foreign governments, including some that cannot be characterized as American allies. SAGE contends that by disclosing the photographs to the members of the Security Council, the government has already let "the cat ... out of the bag," and whatever damage disclosure might do has already been done. SAGE Br. at 24. Surely, SAGE suggests, further release to American citizens and organizations cannot pose greater risk to the national security than release to "foreign governments, which are more likely to convey [classified imagery] to our erstwhile enemies than [SAGE]." *Id.*

Again we disagree, for three reasons. First, we note that it is irrelevant that the plaintiff requesters are Americans, as a disclosure made to any FOIA requester is effectively a disclosure to the world at large. The courts lack authority to limit the dissemination of documents once they are released under FOIA, or to choose selectively among recipients. *See Swan v. SEC,* 96 F.3d 498, 500 (D.C.Cir.1996); *see also Maricopa Audubon Soc'y v. U.S. Forest Serv.,* 108 F.3d 1082, 1088 n. 5 (9th Cir.1997); 1 JAMES T. O'REILLY, FEDERAL

INFORMATION DISCLOSURE §§ 9:37–:44 (3d ed.2000). Hence, we must assume that if the requested photographs are released, they will eventually make their way to foreign governments and others who may have interests that diverge from those of the United States.[12]

Second, we find nothing unreasonable in the government's contention that it may have affirmative foreign policy reasons for sharing sensitive information with some foreign governments and not others. As in this case, the government may well decide that its foreign policy objectives— here, the garnering of support for opposition to ongoing genocide—require disclosing information to member countries of the United Nations Security Council that may be in a position to assist the United States in its efforts, yet at the same time require protecting that information from disclosure to other countries that may actively oppose those policy objectives.

Third, it is significant that Ambassador Albright displayed, but did not distribute, the photographs in question. The government asserts that this display was unlikely to compromise the technical capabilities of its reconnaissance systems, because the U.N. delegates were not likely to possess the expert qualifications required to analyze the photographs, particularly during such a brief viewing. Public (and permanent) release of the documents, by contrast, would offer professional imagery analysts the opportunity to make detailed examinations. It is precisely on a point like this "that a court, lacking expertise in the substantive matters at hand, must give substantial weight to agency statements, so long as they are plausible and not called

into question by contrary evidence or evidence of agency bad faith." *Halperin v. CIA*, 629 F.2d 144, 149 (D.C.Cir.1980); *see Frugone v. CIA*, 169 F.3d 772, 775 (D.C.Cir.1999); *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1388 (D.C.Cir. 1979). As the government's assessment is plausible, and as there is no contrary evidence or evidence of bad faith, we accept its representations and reject the suggestion that the display of the photographs to the Security Council waived the government's right to withhold them from release under FOIA.

### C

Finally, SAGE contends that even if the agencies do not want to disclose the photographs in their present state, they should produce new photographs at a different resolution in order to mask the capabilities of the reconnaissance systems that took them. But although agencies are required to provide "any reasonably segregable," non-exempt portion of an existing record, 5 U.S.C. § 552(b), they are not required to create new documents. *See Yeager v. DEA*, 678 F.2d 315, 321 (D.C.Cir.1982) ("It is well settled that an agency is not required by FOIA to create a document that does not exist in order to satisfy a request." (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161–62, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975))). We are therefore without authority to direct the government to adopt SAGE's "compromise" suggestion.

In sum, we find no merit in SAGE's objections to the manner in which the agencies handled its Category One re-

---

**12.** *See Swan*, 96 F.3d at 500 ("Agencies, and hence courts, must evaluate the risk of disclosing records to some particular FOIA requester not simply in terms of what the requester might do with the information, but also in terms of what anyone else might do with it."); *see also Military Audit Project*, 656

F.2d at 730 n. 11 (noting that the identity of the FOIA requester is immaterial and that, "for example, there is no statutory bar to the military attache of the Soviet embassy filing FOIA requests for information from the CIA and the FBI on the same basis as a United States citizen").

quest, and affirm the district court's grant of summary judgment as to that issue.

## IV

█ In its Category Two request, again as clarified during the litigation, SAGE sought documents, other than photographs, that were "shared" or "specifically referred to" by Ambassador Albright during her presentation to the Security Council on August 10, 1995. In response to this request, the State Department released 46 documents in their entirety and 32 in part, Grafeld Decl. at 9; the National Security Agency (NSA) released part of one document that State had referred to it for review, Grantham Decl. at 2; and the CIA released three documents and three maps, Strickland Decl. at 4. Neither the Department of Defense nor the DIA released any documents, Defs.' Mot. for Partial Summ. J. at 10. All remaining responsive documents were withheld as exempt from production under FOIA. In response to SAGE's clarification that it sought documents Albright actually shared with the members of the Security Council, the government explained that Albright did not share any documents; she shared only information, and the documents that the agencies designated as responsive were those containing that information. Gov't Br. at 48 (citing Mag. Hr'g Tr. at 36–40, 43–47).[13]

We consider SAGE's objections to the State Department's response to this category in Section A below, and consider its objections to the other agencies' responses in Section B.

## A

█ SAGE questions the adequacy of the search the State Department conducted for the Category Two documents. To merit summary judgment on the adequacy of a search, an "agency must demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885, 890 (D.C.Cir.1995) (internal quotation omitted). The agency "must make a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.* (internal quotation omitted). Summary judgment may be based on affidavit, if the declaration sets forth sufficiently detailed information "for a court to determine if the search was adequate." *Id.*

█ The State Department's affidavit meets this standard. The Department declared that it searched twelve separate records systems, including those of several bureaus in Washington, three American embassies in Europe, and two American missions to the United Nations and other international organizations. Grafeld Decl. at 7–8. The declaration also states that the search resulted in the retrieval and review of 137 documents, and notes that of these, 46 were released in their entirety, 32 were released in part, 9 were withheld in full, 21 were transferred to other agencies for review and direct response, and 29 were ultimately deemed non-responsive. *Id.* at 9. Moreover, the government has further represented that the Department

---

13. The distinction is important and is, presumably, the reason that SAGE does not argue on appeal that Albright waived the government's FOIA exemptions by *discussing* the information contained in the documents, as it does argue with respect to her *display* of the photographs considered in Part III *supra*. *Cf.*

*Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C.Cir.1993) ("The law of this circuit provides that an agency official does not waive FOIA Exemption 1 by publicly discussing the general subject matter of documents which are otherwise properly exempt from disclosure under that exemption.").

produced all the documents it could reasonably locate containing the information SAGE sought in its Category Two request. Gov't Br. at 48 (citing Mag. Hr'g Tr. at 36–40, 43–47).

SAGE argues that "[w]hile it might usually be reasonable to take an agency affidavit as indicative of a comprehensive search and retrieval of 'responsive' information, this usual course of analysis must be discarded where an agency references so many documents as 'responsive' when those documents, on their face, do not comport with the FOIA request at issue." SAGE Br. at 15–16. SAGE asserts that documents responsive to its Category Two request could not have been generated earlier than July 10, 1995, the approximate date when Bosnian Serb forces overran Srebrenica, nor later than August 10, the date of Ambassador Albright's presentation. Focusing on the withheld documents described in the State Department's *Vaughn* index, SAGE states that only seven fall within the appropriate date range. SAGE rejects the responsiveness of even those seven, on the ground that the *Vaughn* index descriptions do not specify that the documents were actually used in Ambassador Albright's presentation. All of this, SAGE contends, shows "a serious problem of bad faith" on the part of the State Department. SAGE Br. at 15.

We do not agree that the evidence SAGE points to amounts to a showing of bad faith. The *withheld* documents were not the only ones turned up in the State Department's search; the Department also *released* numerous documents, including significant ones that fall within the requested date range and are responsive to plaintiff's request. One document, for example, is a report from the Assistant Secretary of State for Human Rights, who traveled to Bosnia on July 30–August 1, 1995 and received eyewitness accounts of mass executions in the relevant areas. In-

deed, the State Department even produced the six-page, single-spaced "script" prepared for Ambassador Albright's use during her presentation to the Security Council. Although SAGE dismisses the script as nonresponsive to its request because it is merely a "secondhand account" of the information used by the Ambassador, we regard the Department's production of the document as quite forthcoming.

Further, the fact that many of the released and indexed documents fall outside the July 10–August 10, 1995 date range does not suggest an effort by State to hide a needle in a haystack, as SAGE asserts. As the magistrate explained, the parties simply had different understandings of the scope of SAGE's Category Two request. Because that request sought "documents *containing* the allegedly 'sensitive information' shared" by Ambassador Albright on August 10, 1995, the government fairly read it as requesting documents referencing that information even if they postdated the Ambassador's presentation. Moreover, SAGE's Category Three request, not dismissed until later in the litigation, sought "[a]ny documentation of the above nature [referring to Categories One and Two] pertaining to the commission of war crimes, genocide and atrocities in Bosnia from 1993 to the present." J.A. at 13. This request expressly called for documents dated both prior to July 10, 1995 and after August 10, 1995, and hence the fact that State produced and indexed such documents is not an indication of bad faith.

In sum, that the Department gave SAGE *more* information than it requested does not undermine the conclusion that its search was reasonable and adequate.

**B**

In this Section we address SAGE's challenges to the other agencies' disposition of its Category Two request.

■ SAGE challenges the decision of the NSA to withhold most of a two-page addendum to a State Department document, which State referred to the NSA for review because it originated with the agency. The NSA released two introductory sentences of the addendum that describe the subject matter of the classified paragraphs. *See* J.A. at 134. The NSA explained that it withheld the remainder of the document because:

> The information at issue identifies the targets whose communications have been exploited. To disclose any of this information would inform those targets of their vulnerabilities and of NSA's specific capabilities, sources and methods. If those targets learned or suspected that their communications were being successfully exploited, they would quickly act to engage countermeasures to deny access to those communications by changing their methods.

Grantham Decl. at 6–7. This justification for nondisclosure is sufficiently specific, in light of the substantial weight owed to agency explanations in the context of national security, to qualify for withholding under Exemptions 1 and 3. *Cf. Hayden*, 608 F.2d at 1388 (regarding as "inherently logical" NSA's contention that disclosing the electromagnetic channels it monitors would impair its ability to collect intelligence information).

With respect to the CIA, SAGE contends that the agency's declaration is ambiguous as to whether it found any documents responsive to its Category Two request. We do not find the declaration ambiguous. It clearly states that the CIA released eleven aerial images, three documents, and three maps in response to SAGE's Category One and Two requests combined, and that any remaining CIA records were withheld as exempt. *See* Strickland Decl. at 3–4.

■ Finally, SAGE contends that it remains unclear whether documents withheld by the DIA are properly subject to exemption. A reading of the DIA's declarations makes plain, however, that the DIA located and withheld only one responsive document, a five-page memorandum from the Director of the DIA to the Chairman of the Joint Chiefs of Staff regarding "Evidence of Mass Murder of Srebrenica Muslims." *See* Second Richardson Decl. at 2; Third Richardson Decl. at 2. We agree with the magistrate's conclusion that the DIA met its burden of establishing that release of the document would reveal the classified sources and methods used to collect the information it contains, and thus "enable foreign authorities to … take counter measures which would damage the ability of the U.S. government to acquire" further information. Second Mag. Rep't, 50 F.Supp.2d at 23 (citing Third Richardson Decl. at 5); *see id.* at 26 & n. 1.

### V

SAGE's Category Four request sought information specifically referred to in a letter that Michael Habib, Director of the State Department's Office of Eastern European Affairs, sent to Beth Stephens, of the Center for Constitutional Rights, on March 24, 1993. The Habib Letter stated that the United States had reported information concerning "rape and other grave breaches of the Geneva Conventions" to the United Nations. Habib Letter (quoted in *Kadic v. Karadzic*, 70 F.3d at 250 n. 10). In its briefs on appeal, SAGE contended that State had not produced a single document containing the referenced information.

Our resolution of SAGE's Category Four request has been greatly simplified by developments that ensued after the briefs in this case were filed. On September 26, 2000, shortly before oral argument

was scheduled to take place in this court, the government moved to dismiss SAGE's claim with respect to Category Four on the ground of mootness. The government stated that it had recently discovered an October 29, 1996 communication from the State Department to SAGE's attorney, enclosing all documents responsive to SAGE's Category Four request and withholding none. The government sent SAGE a new copy of the 1996 communication and its enclosed documents. SAGE's counsel replied that it was not clear whether the documents were truly responsive to its request, and that he had "no record or memory" of having received the documents in 1996. Appellants' Opp'n to Mot. for Conditional, Partial Dismissal at 4–5.

On December 12, 2000, after this case was argued, government counsel advised the court of yet another development: a November 8, 2000 statement, written by Michael Habib, declaring that six of the documents produced to SAGE in October 1996 and retransmitted prior to oral argument in September 2000, constituted all of the documents to which he had referred in the Habib Letter. After examining Habib's post-argument statement, SAGE advised us that it was now "satisf[ied] ... that the documents produced in September of 2000 ... include the documents to which Mr. Habib referred in his letter to Beth Stephens [and] so are actually responsive to Category Four of SAGE's FOIA request." Appellants' Resp. to Appellees' Letter Concerning the Merits of a Pending Mot. at 2.

The government contends that whether or not SAGE received the documents in October 1996, the pre-argument transmittal of all documents responsive to the Cat-

egory Four request moots the litigation over the merits of that category. We agree. Courts have "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," but if the government produces all responsive records, FOIA provides no further production-related relief. 5 U.S.C. § 552(a)(4)(B); see Cotton v. Heyman, 63 F.3d 1115, 1118 (D.C.Cir. 1995); Webb v. Dep't of Health and Human Servs., 696 F.2d 101, 107–08 (D.C.Cir. 1982).

SAGE argues, however, that it is still entitled to attorney's fees and costs for its efforts to obtain the Category Four material. See 5 U.S.C. § 552(a)(4)(E) (authorizing the district court to "assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case ... in which the complainant has substantially prevailed"); Webb, 696 F.2d at 107–08 ("Granting full access to the requested documents ... terminates a FOIA action (except possibly for attorneys' fees)."). The district court did not address the issue, and the government states that, "in order to determine if plaintiffs are entitled to" attorney's fees and costs, "a factual record would be helpful concerning when the State Department actually released the records sought." Reply to Appellants' Resp. to Appellees' Letter Concerning the Merits of a Pending Mot. at 3. The government suggests a remand for that limited purpose, and since the parties have not briefed the question of attorney's fees and costs, we agree that a remand would be appropriate so that the district court can consider the issue in the first instance.[14]

14. We note that, after the parties completed their postargument submissions in the instant case, the Supreme Court issued its opinion in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources,* — U.S. —, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). That case held that the term "prevailing party," as employed in statutes authorizing the award of attorney's fees, does not include "a party that has failed to secure a judgment on the merits or a court-

## VI

We remand to the district court SAGE's request for attorney's fees and costs in connection with its Category Four request. In all other respects, the district court's

ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." *Id.* at 1838. Because the parties have not briefed the question, we

grant of summary judgment to the agencies is affirmed.

express no view regarding the applicability of *Buckhannon* to SAGE's request for attorney's fees.