377 P.3d 339

**AMERICAN CIVIL LIBERTIES UNION of Arizona, Plaintiff/Appellant,**

v.

**ARIZONA DEPARTMENT OF CHILD SAFETY, Defendant/Appellee.**

**No. 1 CA–CV 14–0781**

Court of Appeals of Arizona, Division 1.

**FILED 6/9/2016**

Coppersmith Brockelman PLC, Phoenix, By Keith Beauchamp, Roopali H. Desai, Shelley Tolman, Counsel for Plaintiff/Appellant.

Arizona Attorney General's Office, Tucson, By Dawn R. Williams, Counsel for Defendant/Appellee.

Sitren Legal, Phoenix, By Carrie Ann Donnell, Counsel for Amici Curiae Goldwater Institute & Arizona Center for Law in the Public Interest.

Judge Patricia K. Norris delivered the opinion of the Court, in which Presiding Judge Jon W. Thompson and Judge Maurice Portley joined.

## OPINION

NORRIS, Judge:

¶ 1 This appeal arises out of three requests for public records submitted by plaintiff/appellant, the American Civil Liberties Union of Arizona ("ACLU"), to defendant/appellee, the Arizona Department of Child Safety ("DCS"), and its predecessor agency. We hold that when, as here, a state agency maintains public records in an electronic database, Arizona's public records law requires the

agency to take appropriate steps to query and search its database to identify, retrieve, and produce responsive records for inspection. Thus, we reverse the superior court's ruling to the contrary. We agree with the superior court, however, that when, as here, a state agency maintains public records in an electronic database, Arizona's public records law does not require the agency to tally and compile previously untallied and un-compiled information or data available in that database. Accordingly, we affirm in part and reverse in part the superior court's decision. We also remand to the superior court so it may reconsider whether DCS met its statutory obligation to "promptly" furnish certain public records to the ACLU, and whether the ACLU is entitled to an award of attorneys' fees and costs.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 In May 2013, the ACLU submitted a public records request to DCS's predecessor, the Arizona Department of Economic Security ("DES"), which at that time was the state agency statutorily responsible for administering child welfare services, and investigating and responding to allegations of child abuse and neglect. The request, which consisted of 30 separate requests with multiple subparts, sought records concerning child welfare services in the possession of DES's Division of Children, Youth, and Families ("DCYF") and Child Protective Services. Many of the separate requests required DES to tally or compile numerical or statistical information and percentages. For example, request no. 12 asked DES to provide "[t]he number of children who were substantiated victims of abuse and/or neglect perpetrated by their caregiver(s) while placed" in out-of-home: (a) unlicensed foster care; (b) licensed foster care; (c) congregate care. And, request no. 18 asked DES to provide:

> The average number of placements experienced by children in out-of-home care as of the last day of SFY [State Fiscal Year] 2011, 2012 and 2013, or of each of the

Semi-Annual Reporting Periods within those SFYs, by total time in care according to the following (or any similar available) distribution: (a) 1 year or less; (b) 1–2 years; (c) 2–5 years; and (d) more than 5 years.

¶ 3 DES responded to certain of the separate requests relying on information from reports it had previously generated. And, as discussed in more detail below, DES's Report and Statistics Unit retrieved some of the information requested by the ACLU by searching its mainframe based electronic case management system, "CHILDS," an acronym for Children's Information Library and Data Source. DES produced records responsive to 14 of the ACLU's separate requests between May and October 2013. But, by year's end, DES had not produced records responsive to the remaining separate requests.

¶ 4 On January 28 and 31, 2014, the ACLU submitted a second and a third public records request to DES, and its newly created Department of Child Safety and Family Services ("DCSFS").[1] The January 28 request asked for information about children in foster care, that is, out-of-home placement; the January 31 request asked for information about children who may have been abused or neglected, but were not in foster care at the time DES received reports of their possible mistreatment.

¶ 5 The January 28 request contained 37 separate requests with multiple subparts; the January 31 request contained 24 separate requests, also with multiple subparts. Both requests again required DES to tally or compile numerical or statistical information and percentages. For example, the January 28 request no. 28 asked DES to provide "the number of children in the following age groups who were placed in shelters at any time during the requested periods while in DES foster care custody: (a) ages 0–1; (b) ages 1–5; (c) ages 6–8; (d) ages 9–12; and (e) ages 13–17." The January 31 request no. 1 asked DES to provide:

---

1. By executive order issued on January 13, 2014, then Governor Janice K. Brewer established DCSFS and abolished DCYF.

[T]he number of Reports concerning children who were not in out-of-home care that were assigned for investigation as Priority 1: High Risk, and that (a) were initiated in a timely manner, and (b) not initiated in a timely manner. For purposes of this question, "initiated in a timely manner" means that the investigation's Initial Response Time was two hours or less if the investigation was assigned a Standard Response Time, or 24 hours or less if assigned a Mitigated Response Time.

DES did not acknowledge receipt of the January 2014 requests until April 28, 2014.

¶ 6 On May 2, 2014 the ACLU filed a statutory special action asking the superior court to order DES to provide "copies" of all the requested records it had failed to produce, index of any records it had withheld, and its reason for withholding any record. *See* Ariz. Rev. Stat. ("A.R.S.") § 39–121.01(D)(2) (Supp. 2015)[2] (detailing agency's obligations when it withholds public records); A.R.S. § 39–121.02(A) (Supp. 2015) (authorizing special action from denial of access to public records). The ACLU also requested an award of attorneys' fees and costs. *See* A.R.S. § 39–121.02(B) (authorizing award of attorneys' fees and costs reasonably incurred if person seeking public records has "substantially prevailed"). Subsequently, consistent with legislation that created DCS as the new standalone agency responsible for state-mandated child welfare functions, DCS replaced DES as the sole defendant in the case. As we discuss below, during the course of the litigation, DCS provided additional public records to the ACLU. *See infra* ¶ 31.

¶ 7 After discovery, briefing, and an evidentiary hearing, the superior court rejected the ACLU's request that it order DCS to produce records responsive to the remaining outstanding record requests ("the outstanding requests").[3] The court held that Arizona's public records law did not require DCS to respond to the outstanding requests because the ACLU was not seeking existing records, but instead was asking DCS to "create" new

public records. The court ruled that Arizona's public records law did not require an agency to create a public record by "writ[ing] a new software program to obtain the [requested] information" or by "research[ing] and analyz[ing] data to compile statistics, which is a process that creates records where none exist." And, although the superior court acknowledged the ACLU had argued that the non-confidential data in CHILDS constituted a public record, it did not directly decide the issue.

## DISCUSSION

### I. CHILDS is a Public Record

■ ¶ 8 The ACLU first argues the superior court should have decided that the electronic records and data maintained by DCS in CHILDS makes CHILDS a public record, and, therefore, DCS was required to query or search CHILDS to respond to its public records requests. Exercising de novo review, we agree with the ACLU that the electronic records and data maintained by DCS in CHILDS makes CHILDS a public record. *See Griffis v. Pinal Cty.*, 215 Ariz. 1, 3, ¶ 7, 156 P.3d 418, 420 (2007) (whether document is a public record under Arizona's public records law presents a question of law subject to de novo review).

¶ 9 Arizona law defines "public record" broadly and creates a presumption requiring the disclosure of public documents. *Id.* at 4, ¶ 8, 156 P.3d at 421; *see also* A.R.S. § 39–121 (2011) (affirming presumption of openness; "[p]ublic records and other matters in the custody of any officer shall be open to inspection by any person at all times during office hours"). Although our statutes do not expressly define the phrase "public records and other matters," A.R.S. § 39–121.01(B) requires "[a]ll officers and public bodies" to maintain all records "reasonably necessary or appropriate to maintain an accurate knowledge of [a public entity or officer's] official activities and of any of their activities

---

2. We cite to the current version of each statute cited in this opinion.

3. The court identified the outstanding requests as follows: "May 6, 2013 Request: Items 9–13, 15–

18, 23[;] January 28, 2014 Request: Items 1–23, 26–34[; and] January 31, 2014 Request: Items 1–22, 24."

which are supported by monies from this state or any political subdivision of this state." As the Arizona supreme court recognized in *Carlson v. Pima County*, this language creates a "statutory mandate which, in effect, requires all officers to make and maintain records reasonably necessary to provide knowledge of all activities they undertake in the furtherance of their duties." 141 Ariz. 487, 490, 687 P.2d 1242, 1245 (1984) (discussing virtually identical predecessor statute to A.R.S. § 39–121.01(B)). The supreme court has also described three alternative categories of public records:

A public record is one "made by a public officer in pursuance of a duty, the immediate purpose of which is to disseminate information to the public, or to serve as a memorial of official transactions for public reference"; a record that is "required to be kept, or necessary to be kept in the discharge of a duty imposed by law or directed by law to serve as a memorial and evidence of something written, said or done"; or any "written record of transactions of a public officer in his office, which is a convenient and appropriate method of discharging his duties, and is kept by him as such, whether required by ... law or not."

*Griffis*, 215 Ariz. at 4, ¶ 9, 156 P.3d at 421 (quoting *Salt River Pima–Maricopa Indian Cmty. v. Rogers*, 168 Ariz. 531, 538–39, 815 P.2d 900, 907–08 (1991)).

█ ¶ 10 Arizona's broad definitions of a public record are not, however, unlimited—they do not encompass documents of a purely private or personal nature. *Id.* at 4, ¶ 10, 156 P.3d at 421. Accordingly, "only those documents having a 'substantial nexus' with a government agency's activities qualify as public records." *Id.* (footnote omitted). The nature and purpose of a document controls whether it is a public record; therefore, determining a document's status requires a content-driven inquiry. *Id.*

¶ 11 Consistent with this content-driven inquiry, records and data maintained electronically can be as much a public record as records and data maintained on paper. Indeed, the statutory directive contained in A.R.S. § 39–121.01(B), requiring officers and

public bodies to maintain all records "reasonably necessary or appropriate to maintain an accurate knowledge of their official activities," incorporates by reference the definition of records contained in A.R.S. § 41–151.18 (2013). The incorporated definition broadly defines "records" as including not only "papers," but also "other documentary materials, regardless of physical form or characteristics." *See also Lake v. City of Phoenix* ("*Lake II*"), 222 Ariz. 547, 550–51, ¶¶ 12–14, 218 P.3d 1004, 1007–08 (2009) (when public entity maintains a public record in electronic format, the electronic version of the record, including embedded metadata, is subject to disclosure under Arizona public records law).

¶ 12 Under any of the formulations of a public record discussed above, and based on its content, CHILDS is a public record. DES developed CHILDS in 1996 and 1997 to comply with federal criteria for a statewide automated child welfare system. DES used, and now DCS uses, CHILDS to meet its obligations to maintain all reports of child abuse and neglect. A.R.S. §§ 8–804 (Supp. 2015), –804.01 (2014). And, as the manager of DCS's Report and Statistics Unit explained at the evidentiary hearing, DCS uses CHILDS to manage its cases, staff, providers, and provider payroll system. Further, as DCS acknowledged in its briefing on appeal, the "records and information in CHILDS are crucial to [DCS's] ability to achieve its stated purpose of 'protecting children'" both on a "micro" level, that is, on a day-to-day basis concerning a specific case, and on a "macro" level, that is, in providing "aggregate data about child welfare operations, as opposed to case-specific information." Based on these uncontested facts, and DCS's own description of how it uses CHILDS, the electronic records and data in CHILDS makes CHILDS a public record under Arizona law.

II. Electronically Maintained Public Records—A Duty to Search, Not Create

█ ¶ 13 The superior court ruled that Arizona's public records law did not require an agency to create a public record by "writ[ing] a new software program to obtain the [requested] information," or by "research[ing] and analyz[ing] data to compile

statistics, which is a process that creates records where none exist." On appeal, the ACLU challenges both rulings. Although we agree with the ACLU that Arizona's public records law requires an agency to search its electronic database for public records, we also agree with the core of the superior court's additional ruling—Arizona's public records law does not require an agency to tally and compile previously untallied and uncompiled information or data to respond to a public records request.

■ ¶ 14 Under Arizona's public records law, an agency is required to search for records upon request. Otherwise, the public has no meaningful right to inspect public records. *See* A.R.S. § 39–121 (public records and other matters "shall be open to inspection"); A.R.S. § 39–121.01(D)(1) ("Any person may request to examine or be furnished copies, printouts or photographs of any public record during regular office hours or may request that the custodian mail a copy of any public record not otherwise available on the public body's website to the requesting person."); *Phoenix New Times, L.L.C. v. Arpaio*, 217 Ariz. 533, 539, ¶ 16, 177 P.3d 275, 281 (App. 2008) ("[A]n agency must make a good faith effort to conduct a search for the requested records.").

¶ 15 When a public employee fills out a form to obtain public records from, for example, a storage or file room, the employee has created a record to retrieve records that already exist. Creating a query to search an electronic database is functionally the same. As amici curiae Goldwater Institute and Arizona Center for Law in the Public Interest explained in their amicus brief: " '[F]inding' a [public] record cannot simultaneously require its 'creation;' either a [public] record exists to be found, or it does not." Thus, although creating or "writing" a search query to find electronically stored public records may create a record, that act does not simultaneously create the public record originally requested. To hold otherwise would, as the ACLU argues on appeal, "functionally place most records maintained in public agency databases outside of the public records law."

¶ 16 In *Lake v. City of Phoenix* ("*Lake I* "), we explained "a public record that would otherwise be subject to Arizona's public records law does not become immune from production simply by virtue of the method the City employs to catalogue the document." 220 Ariz. 472, 481, ¶ 26, 207 P.3d 725, 734 (App. 2009), *vacated in part, Lake II*, 222 Ariz. 547, 218 P.3d 1004 (2009). In *Lake I*, a former police officer requested public records—police reports which the city maintained in its electronic database. 220 Ariz. at 481, ¶ 25, 207 P.3d at 734. We rejected, "as a matter of law," the city's argument that it was not required to search the database to produce public records because the database contained confidential federal and state criminal history information. *Id.* at 481, ¶ 26, 207 P.3d at 734. We explained, "[i]f the City has selected [the database] as its database of choice for collecting and storing records, then it must also assume the responsibility of producing such records in response to record requests that comply with the public records law." *Id.* at 482, ¶ 29, 207 P.3d at 735. The same reasoning applies here. Because DCS uses CHILDS to maintain and collect the records it needs to do its job, it must query or search CHILDS to comply with its obligations under Arizona's public records law.

■ ¶ 17 But those obligations do not require DCS to tally or compile previously untallied and un-compiled information or data to respond to a public records request. *Cf. Judicial Watch, Inc. v. City of Phoenix*, 228 Ariz. 393, 400, ¶ 31, 267 P.3d 1185, 1192 (App. 2011) (city not required to provide a separate index detailing reasons for redactions; public records statute did not require such an index and city was not required to create a "new public document"). Here, the outstanding requests asked DCS to tally or compile numerical or statistical information and percentages. *See supra* ¶¶ 2, 5; *infra* ¶23. Although the superior court used different terminology in its ruling—"research and analyze"—we nevertheless agree with its core conclusion: our public records law does not require an agency, in responding to a public records request, to create a new record that compiles analytical information about information.

¶ 18 Searching an electronic database to produce existing records and data is not the same as searching an electronic database to compile information about the information it contains. Courts construing the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, have recognized this distinction, and their reasoning is persuasive. *See Phoenix New Times,* 217 Ariz. at 539 n. 3, ¶ 15, 177 P.3d at 281 n. 3 ("When interpreting Arizona's public records statutes, it is appropriate to look to FOIA for guidance.").

¶ 19 For example, *National Security Counselors v. Central Intelligence Agency* recognized that searching a database to respond to a FOIA request did not involve the creation of a new record because the agency would have to use some form of programming to retrieve the information. 898 F.Supp.2d 233, 270 (D.D.C. 2012). Sorting a database by a data field (*e.g.,* date, category, title), the court explained, did not involve creating a new record or conducting research—it was just another form of searching. *Id.* But the court recognized a distinction with respect to FOIA requests for "aggregate data," that is, data that required the creation of a new record that listed, indexed or aggregated information about the information in the database. *Id.* at 271. The court recognized that a request for aggregate data required the agency to create a new record— a duty not imposed on an agency by FOIA. *Id.* In explaining the distinction between searching for records and creating records, the court drew a helpful analogy to requests for paper records:

> [A] request seeking "a database listing of the first 100 FOIA requests filed in Fiscal Year 2012," may require the creation of a new record because the record being requested ... is not necessarily something "that an agency has in fact chosen to create and retain." The same would be true of paper, rather than electronic, records. For example, if a FOIA request sought "an inventory of all non-electronic records created in 1962 regarding the Cuban Missile Crisis," an agency need not create an inventory if one did not already exist, though the agency would need to release any such non-electronic records themselves if they were requested and were not exempt from

disclosure. Therefore, a FOIA request for a listing or index of a database's contents that does not seek the contents of the database, *but instead essentially seeks information about those contents,* is a request that requires the creation of a new record, insofar as the agency has not previously created and retained such a listing or index.

*Id.* (internal citations omitted) (emphasis added).

■ ¶ 20 By analogizing to requests for paper records, the court placed less emphasis on the electronic storage and retrieval, and more emphasis on the end result. Thus, under FOIA, an agency has no legal duty to create a new record that compiles or aggregates information about preexisting records. *Id.* at 271–272; *see also West v. Spellings,* 539 F.Supp.2d 55, 61 (D.D.C. 2008) ("It is well settled that an agency is not required by FOIA to create a document that does not exist in order to satisfy a request.") (internal citations omitted).

¶ 21 Other federal courts have recognized that requests for information about information, that is, requests for information that has not been previously compiled, are not requests for existing records under FOIA. *See, e.g., Jean–Pierre v. Fed. Bureau of Prisons,* 880 F.Supp.2d 95 (D.D.C. 2012). There, a prisoner requested information about "who gave the Order to take [him] out of Schuykill Federal Camp." *Id.* at 98. The court held the request was not cognizable under FOIA because the prisoner's questions sought information about records, and FOIA did not require an agency to respond to "questions disguised as FOIA requests." *Id.* at 103 (internal citations omitted); *accord Serv. Women's Action Network v. Dep't of Def.,* 888 F.Supp.2d 231, 241 (D. Conn. 2012) (because "an agency need not respond to or answer questions disguised as a FOIA request," agency had no duty to respond to requests for statistical or aggregate data, such as the number of certain types of documents and the gender/race breakdown of certain information) (internal citations omitted); *Frank v. U.S. Dep't of Justice,* 941 F.Supp. 4, 4–5 (D.D.C. 1996) (request asking Department of

Justice for the "number of Special Assistant United States Attorneys that were state and local prosecutors" for different periods of time improper under FOIA; "FOIA provides access to existing records but does not establish a research service").

¶ 22 Many state courts have also concluded that their public records law does not require a governmental entity to summarize, aggregate, or compile information about preexisting records. *See, e.g., Chicago Tribune Co. v. Dep't of Fin. and Prof'l Regulation,* 380 Ill. Dec. 80, 8 N.E.3d 11, 19 (Ill. App. Ct. 2014) (newspaper's request for number of initial claims received by public agency did not seek production of a public record but requested "the Department to perform a review of its investigative files and prepare a tally as to the number of initial claims made," which was "more akin to an interrogatory in a civil action than a request for records brought pursuant to FOIA"); *Comptroller of Treasury v. Immanuel,* 216 Md.App. 259, 85 A.3d 878, 885 (2014) (requester sought printout of all unclaimed property owners plus certain other information maintained by state in electronic database; state required to search database for this information, emphasizing, however, that request did not require state to "generate new data [or] perform any analysis on existing data"); *State ex rel. Kerner v. State Teachers Ret. Bd.,* 82 Ohio St.3d 273, 695 N.E.2d 256, 258 (1998) (board had no duty to create new document by searching for and compiling information from existing records; board did not have the requested compilation of information; to create requested compilation, the "board would have had to reprogram its computer system. Therefore, the board had no duty to provide access to the requested records."); *Tennessean v. Elec. Power Bd. of Nashville,* 979 S.W.2d 297, 304 (Tenn. 1998) (utility required to disclose its customers' names, addresses, and telephone numbers as available in its electronic database; request did not, however, "require an explanation, interpretation, or analysis of information").

¶ 23 The superior court correctly recognized the ACLU's outstanding requests were asking DCS to tally and compile aggregate information contained in CHILDS—information that DCS had not previously tallied and compiled. For example, as the superior court found, to respond to the May 2013 request no. 12, DCS would have had to write a computer program to extract the raw data from CHILDS responsive to the request, and then would have had to determine or calculate the number of children who fell within the various categories identified in the request. Similarly, the superior court found that even though raw data responsive to request no. 18 was in an existing "data file," DCS would still have had to determine how many children were in out-of-home care during the requested time frames, and analyze that information by length of time in care. Then, for each distribution, it would have had to determine how many placements those children had experienced during the specified time periods, and based on the total number of children in each distribution category, determine the average number of placements for children in those categories.

¶ 24 As the foregoing examples illustrate, the ACLU's outstanding requests sought information about information—information that DCS had not previously compiled. Arizona's public records law does not, however, require an agency to create a new record that compiles information about information maintained electronically or, indeed, in paper. We acknowledge that distinguishing between searching an electronic database and creating a new record that compiles previously un-compiled information about information may be a difficult task. But on this record, we agree with the superior court that DCS was not "legally required" to respond to the outstanding requests.

¶ 25 The ACLU nevertheless argues that even if the outstanding requests required DCS to create new records, Arizona's public records law required DCS to do so because CHILDS contained confidential information that DCS could not redact.[4] Thus, the ACLU

---

4. CHILDS contains both confidential and non-confidential information pursuant to A.R.S. § 8– 807 (2015).

argues "inspection [was] not an option," and the only meaningful way it could obtain public record information stored in CHILDS was to require DCS to provide it. Indeed, at oral argument in this court, the ACLU asserted DCS (and its predecessor) had not produced CHILDS for inspection even though it had asked DCS to do so, citing wording in its three public records requests that asked for "all records reflecting the following public information . . . in accordance with how such information is kept." [5]

¶ 26 First, as an initial matter, the record fails to support the ACLU's assertion that it asked to inspect CHILDS. Instead, the record demonstrates the dispute between the parties concerned the ACLU's separate requests, and not whether the ACLU could inspect CHILDS. Indeed, at the evidentiary hearing, the superior court asked the ACLU's counsel about "access to the mainframe." Instead of informing the court that the ACLU had in fact asked to inspect CHILDS, counsel merely responded, "There certainly are instances in which that happens."

¶ 27 Second, the wording the ACLU relies on in asserting it asked to inspect CHILDS—"all records . . . in accordance with how such information is kept"—did not constitute a request to inspect CHILDS. The outstanding requests asked DCS to tally and compile information in CHILDS that had not been previously tallied or compiled. Thus, DCS had nothing to provide "in accordance with how such information is kept."

¶ 28 Third, and perhaps most importantly, neither DCS nor the ACLU presented any evidence to the superior court that DCS could not produce CHILDS for inspection because DCS was unable to redact confidential information. Although the superior court and the parties may have generally assumed

DCS could not redact confidential information from CHILDS, the record contains no evidence showing this.

¶ 29 As we have previously emphasized, there are no "sweeping exemption[s] from the public records laws of this state," *Judicial Watch, Inc.*, 228 Ariz. at 399, ¶ 28, 267 P.3d at 1191, and a governmental entity always bears the burden of overcoming the presumption of disclosure. *Id.* at 395, ¶ 10, 267 P.3d at 1187; *see also Hodai v. City of Tucson*, 239 Ariz. 34, 38, ¶ 7, 365 P.3d 959, 963 (App. 2016). To meet this burden, a governmental entity must demonstrate specific material harm or risks to privacy, confidentiality, or the best interests of the state. *Hodai*, 239 Ariz. at 41, ¶ 20, 365 P.3d at 966. And, "[b]ecause it is always possible to argue that public records contain nondiscoverable matter, argument alone would always allow nonrevelation." *Star Publ'g Co. v. Pima Cty. Attorney's Office*, 181 Ariz. 432, 434, 891 P.2d 899, 901 (App. 1994). A governmental entity fails to meet its burden of overcoming the presumption in favor of disclosure when it puts forth only "global generalities" of harm. *Judicial Watch, Inc.*, 228 Ariz. at 400, ¶ 29, 267 P.3d at 1192.

¶ 30 In sum, "public records are presumed open to the public for inspection unless the public official can demonstrate *a factual basis* why a particular record ought not be disclosed to further an important public or private interest." *Star Publ'g Co.*, 181 Ariz. at 434, 891 P.2d at 901 (citations omitted) (emphasis added). The record contains no evidence to support the ACLU's argument that confidentiality concerns precluded DCS from producing CHILDS for inspection, or that the ACLU ever asked to inspect it. Accordingly, we reject the ACLU's argument that Arizona's public records law required

---

5. In full, the following language preceded the 30 separate requests the ACLU submitted to DES in May 2013: "Please provide any and all records reflecting the following public information for each of the State Fiscal Years ("SFY") 2011, 2012, and 2013; or for each Semi–Annual Reporting Period, as defined by A.R.S. § 8–526, within each of those SFYs; or for any other period (such as by quarter or by month) within each of those SFYs, in accordance with how such information is kept."

The language preceding the separate requests in the two January 2014 requests was materially the same. In pertinent part, the January 2014 requests read as follows: "Unless indicated otherwise in any of the individual requests below, please provide any and all records reflecting the following public information . . . in accordance with how such information is kept."

DCS to create new records compiling previously un-compiled information because "inspection was not an option."

### III. The Post–Litigation Records

¶ 31 As noted, DES produced records responsive to 14 of the ACLU's May separate requests between May and October 2013. *See supra* ¶ 3. And, as also noted, DCS did not acknowledge receipt of the ACLU January 2014 requests until April 28, 2014. *See supra* ¶ 5. Then, in May and June 2014, after the ACLU filed this case, DCS produced records responsive to 13 of the separate requests contained in the ACLU's May 2013 and January 2014 requests ("post-litigation records"), which, the superior court found, had not required DCS to create new records.[6] The ACLU argues on appeal that although the superior court found DCS's delay in acknowledging receipt of the January 2014 requests "was excusable under the circumstances," it failed to decide whether DCS had "promptly furnish[ed]" the post-litigation records as required by A.R.S. § 39–121.01(D)(1) (upon request, custodian "shall promptly furnish" records), and A.R.S. § 39–121.01(E) (access to public record deemed denied if custodian "fails to promptly respond" to public record request).[7] We agree with the ACLU that the superior court did not, but should have, decided this issue. Therefore, we remand to the superior court for it to decide whether DCS promptly furnished the post-litigation records. On remand, the superior court should consider the following principles.

¶ 32 Although neither our public records statutes nor interpretive case law fixes a timeframe for an agency to produce documents, "prompt" for purposes of our public records law is "being 'quick to act' or producing the requested records 'without delay.'" *Phoenix New Times*, 217 Ariz. at 538, ¶ 14, 177 P.3d at 280. On remand, consistent with the statutory obligation imposed on it,

DCS will bear the burden of showing its production of the post-litigation records was prompt in the context of the particular facts and circumstances of this case. *Id.* at 538–39, ¶ 15, 177 P.3d at 280–81. These circumstances include whether any delay was caused by inattentiveness. *Id.* at 541, ¶ 27, 177 P.3d at 283 ("evidence of inattentiveness on the part of the public body does not establish the promptness of a response"). These circumstances also include the breadth and complexity of the ACLU's requests for the post-litigation records, and the availability of these records. *See West Valley View, Inc. v. Maricopa Cty. Sheriff's Office*, 216 Ariz. 225, 230 n. 8, ¶ 21, 165 P.3d 203, 208 n. 8 (App. 2007) (county sheriff required to produce "at once" single category of document that was available for immediate production). These circumstances further include whether the best interests of the state outweighed any delay in disclosing these records. *Star Publ'g Co. v. Parks*, 178 Ariz. 604, 605, 875 P.2d 837, 838 (App. 1993) (one-month delay in producing public records not permitted because public entity could not prove specific risk of timely disclosure).

¶ 33 In evaluating the best interests of the state against any delay in producing the post-litigation records, the court should consider whether the ACLU's requests for the post-litigation records posed an "unreasonable administrative burden." *Hodai*, 239 Ariz. at 43, ¶ 27, 365 P.3d at 968. In this regard, although the ACLU has argued that no Arizona court has ever recognized that the burden of responding to public records requests can outweigh the public interest in the production of public records, the Arizona supreme court in an analogous situation and this court have recognized precisely that.

¶ 34 In *London v. Broderick*, 206 Ariz. 490, 491, ¶ 1, 80 P.3d 769, 770 (2003), our supreme court analyzed whether Arizona Supreme Court Rule 123, the court's "open records"

---

6. Specifically, the superior court found that after the ACLU filed this case, DCS produced records responsive to "items 19–21, 22(b) and (c) of the May 2013 request, item 25 of the January 28 request, and item 23 of the January 31 request to the extent that it possessed responsive existing records."

7. The ACLU has not challenged on appeal the promptness of DES's production of records in 2013.

provision, permitted disclosure of a probation department's investigatory file of a department employee who faced disciplinary charges. The court recognized that Rule 123 had the same purpose as Arizona's public records law, *id.* at 493, ¶ 8, 80 P.3d at 772, and relied on cases applying our public records law, *id.* at 493, ¶ 9, 80 P.3d at 772, in holding that the investigatory file was exempt from disclosure under Rule 123. *Id.* at 496, ¶ 24, 80 P.3d at 775. Significantly, the court recognized that "sometimes the benefits of public disclosure must yield to the burden imposed on private individuals or the government itself by disclosure." *Id.* at 493, ¶ 9, 80 P.3d at 772.

¶ 35 This court has also recognized that the burden of producing public records may outweigh the public's interest in inspecting public records. In *Hodai*, the superior court refused to order a city to produce all records of communications between its police department and the FBI during a one-year period, finding the request overly broad and burdensome. 239 Ariz. at 43, ¶ 28, 365 P.3d at 968. On appeal, the requester argued burden was not a recognized exception to Arizona's public records law. *Id.* at 42–43, ¶ 26, 365 P.3d at 967–68. We rejected that argument, recognizing an unreasonable administrative burden may constitute a sufficient reason to deny a public records request under Arizona law. *Id.* at 43, ¶ 27, 365 P.3d at 968. We explained the analysis of what constitutes an unreasonable administrative burden "is, at its core, an inquiry into whether 'the best interests of the state in carrying out its legitimate activities outweigh the general policy of open access.'" *Id. (quoting Carlson*, 141 Ariz. at 491, 687 P.2d at 1246). *See also Judicial Watch, Inc.*, 228 Ariz. at 397, ¶ 17, 267 P.3d at 1189 ("the burden of producing public records can outweigh the public's interest in inspecting those records"); *Phoenix Newspapers, Inc. v. Keegan*, 201 Ariz. 344, 348–49, ¶ 18, 35 P.3d 105, 109–10 (App. 2001) ("best interests of the state" exception to disclosure "not confined to the narrow interest of either the official who holds the records or the agency he or she serves[;] [i]t includes the overall interests of the government and the people," including the government's administrative interest and whether "disclosure would adversely affect the agency's mission").

■ ¶ 36 Consistent with the foregoing authorities, on remand DCS will bear the burden of showing that the ACLU's request for the post-litigation documents posed an unreasonable administrative burden. As in *London*, DCS must "articulate[ ] sufficiently weighty reasons to tip the balance away from the presumption of disclosure and toward nondisclosure." 206 Ariz. at 493, ¶ 9, 80 P.3d at 772. And, as recognized in *Hodai*, in deciding whether DCS has met this burden, the court should consider the resources and time it took to locate and redact, as necessary, the requested materials; the volume of materials requested; and the extent to which compliance with the requests disrupted DCS's ability to perform its core functions. *Hodai*, 239 Ariz. at 43, ¶ 27, 365 P.3d at 968.

## IV. The ACLU's Request for an Award of Attorneys' Fees and Costs

¶ 37 The superior court denied the ACLU's request for an award of attorneys' fees and costs under A.R.S. § 39–121.02(B). That statute authorizes a court to award "attorney fees and other legal costs that are reasonably incurred in any action under [the public records statutes] if the person seeking public records has substantially prevailed." The court found the ACLU had not "substantially prevailed" in the case. We have, however, ruled, in part, in the ACLU's favor, and we are remanding to the superior court to determine whether DCS promptly provided the ACLU with the post-litigation documents. In this regard, we note that by statute, if a party does not receive a prompt response to a public record request, "[a]ccess to a public record is deemed denied." A.R.S. § 39–121.01(E). Given these circumstances, we reverse the superior court's denial of the ACLU's request for an award of fees and costs, and on remand direct the superior court to reconsider whether the ACLU has "substantially prevailed" in this case.

## V. Attorneys' Fees and Costs on Appeal

¶ 38 The ACLU has also requested an award of attorneys' fees and costs on appeal under A.R.S. § 39–121.02(B). Given the is-

sues remaining for the superior court to decide, we deny the ACLU's request without prejudice so that, on remand, the superior court may rule on the ACLU's request for fees and costs on appeal.

## CONCLUSION

¶ 39 For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings as instructed in this opinion.